# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * *
| | |
|---|---|
| DAVID TUTT, as personal representative of the Estate of THOMAS TUTT, deceased, | |
| | No. 16-385V |
| | Special Master Christian J. Moran |
| Petitioner, | |
| v. | Filed: February 3, 2020 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Fact ruling; transverse myelitis ("TM"); onset of symptoms. |
| Respondent. | |

* * * * * * * * * * * * * * * * * * * *

Karen H. Ross, The Law Office of Karen H. Ross, Henderson, NV, for petitioner;
Lisa A. Watts, United States Dep't of Justice, Washington, DC, for respondent.

## UNPUBLISHED RULING FINDING FACTS[*]

The petition, filed under the National Childhood Vaccine Injury Compensation Program, 42 U.S.C. § 300aa–10 through 34 (2012), alleges that Thomas Tutt suffered from transverse myelitis ("TM") as a result of the influenza vaccine he received on November 14, 2013. Pet., filed Mar. 25, 2016, at 1. The parties dispute when Mr. Tutt started to experience symptoms potentially associated with TM.[1]

---

[*] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this ruling on its website. Anyone will be able to access this ruling via the internet (https://www.uscfc.uscourts.gov/aggregator/sources/7). Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

[1] Mr. Tutt passed away on November 25, 2018, see Pet'r's Status Rep., filed Mar. 21, 2019, ¶ 1, and his son, David Tutt, became the personal representative of his estate and was

**Procedural History**

The claim is that a November 13, 2014 flu vaccination caused Mr. Tutt to develop transverse myelitis that was diagnosed on January 25, 2015, after an MRI. As support for this claim, Mr. Tutt filed affidavits and medical records. In his affidavit, Mr. Tutt asserted that he had neck pains on Wednesday, November 27, 2013. Exhibit 17, ¶ 4. Mr. Tutt retained an expert who opined that these neck pains were prodromal symptoms of the transverse myelitis. Exhibit 23 at 14.

The Secretary disputed Mr. Tutt's claim. The Secretary maintained that a 69-day time between vaccination and onset of TM was not appropriate. The Secretary also identified an upper respiratory infection diagnosed on January 13, 2014, approximately 11 days prior to Mr. Tutt's TM diagnosis, as a potential alternative cause of the TM. See Resp't's Rep., filed Aug. 2, 2016, at 2-3, 6-7.

Whether Mr. Tutt had neck pains in the weeks after his vaccination appeared to be a critical aspect of the expert opinion. Thus, Mr. Tutt was directed to develop evidence on this point. Accordingly, Mr. Tutt submitted, among other documents, records from chiropractor visits at Albuquerque Neck & Back Pain Center that spanned from December 23, 2010, to November 10, 2011. See exhibit 62 (filed Oct. 19, 2017) at 1-2. However, the handwriting in many of these records was not legible and Mr. Tutt was directed to obtain a transcription. At the pre-hearing conference, a transcription of the chiropractor's records remained outstanding. See order, issued Feb. 8, 2018. Mr. Tutt filed supplemental records from Albuquerque Neck & Back Pain Center, which included notes from an additional visit on December 4, 2013. See exhibit 70 (filed Feb. 7, 2018) at 2. Because these supplemental records revealed that Mr. Tutt had sought chiropractic care in the critical time (after the November 2014 flu vaccination and before the January 2015 hospitalization), the undersigned wanted the chiropractor to testify. Order, issued Feb. 8, 2018.

A hearing was held on February 15, 2018, in Albuquerque, New Mexico, in which seven witnesses, including Mr. Tutt, testified. Mr. Tutt's chiropractor, Dr. Denbign, also testified. Dr. Denbign brought his complete file to the witness stand and, in doing so, produced records that had not been previously filed. Tr. 230-31.

---

substituted as petitioner in the case on August 20, 2019, see Order, issued Aug. 20, 2019, ECF No. 91. In this ruling, "Mr. Tutt" is Thomas Tutt.

These additional records included documentation from visits in 2007-2009, and were later filed by Mr. Tutt's counsel on March 14, 2018.  <u>See</u> exhibit 72 (filed Mar. 14, 2018), ECF No. 65.

After the hearing, the undersigned issued an order directing the parties to file Proposed Findings of Fact focusing on facts relevant to the issue of causation.  <u>See</u> Order, issued Feb. 21, 2018, ECF No. 61.  The parties submitted their final combined set of Proposed Findings of Fact on November 20, 2019.[2]  <u>See</u> Proposed Findings of Fact, filed Nov. 20, 2019, ECF No. 101.

## Standard for Finding Facts

Petitioners are required to establish their cases by a preponderance of the evidence.  42 U.S.C. § 300aa–13(1)(a).  The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence."  <u>Moberly v. Sec'y of Health & Human Servs.</u>, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition.  42 U.S.C. § 300aa–11(c)(2).  Medical records that are created contemporaneously with the events they describe are presumed to be accurate.  <u>Cucuras v. Sec'y of Health & Human Servs.</u>, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Not only are medical records presumed to be accurate, they are also presumed to be complete, in the sense that the medical records present all the patient's medical issues.  Completeness is presumed due to a series of propositions.  First, when people are ill, they see a medical professional.  Second, when ill people see a doctor, they report all of their problems to the doctor.  Third, having heard about the symptoms, the doctor records what he or she was told.

Appellate authorities have accepted the reasoning supporting a presumption that medical records created contemporaneously with the events being described are accurate and complete.  A notable example is <u>Cucuras</u> in which petitioners

---

[2] Issues related to Mr. Tutt's counsel of record extended the interval between the conclusion of the hearing and the submission of Proposed Findings of Fact.

3

asserted that their daughter, Nicole, began having seizures within one day of receiving a vaccination, although medical records created around that time suggested that the seizures began at least one week after the vaccination.  Cucuras, 993 F.3d at 1527.  A judge reviewing the special master's decision stated that "[i]n light of [the parents'] concern for Nicole's treatment . . . it strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms.  It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred."  Cucuras v. Sec'y of Health & Human Servs., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993).

      Judges of the Court of Federal Claims have followed Cucuras in affirming findings by special masters that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date.  See, e.g., Doe/70 v. Sec'y of Health & Human Servs., 95 Fed. Cl. 598, 608 (Fed. Cl. 2010) (stating "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), aff'd sub nom. Rickett v. Sec'y of Health & Human Servs., 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); Doe/17 v. Sec'y of Health & Human Servs., 84 Fed. Cl. 691, 711 (2008); Ryman v. Sec'y of Health & Human Servs., 65 Fed. Cl. 35, 41-42 (2005); Snyder v. Sec'y of Health & Human Servs., 36 Fed. Cl. 461, 465 (1996) (stating "The special master apparently reasoned that, if Frank suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record professionals who evaluated Frank during his life to date.  Finding Frank's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity."), aff'd, 117 F.3d 545, 547-48 (Fed. Cir. 1997).

      The presumption that contemporaneously created medical records are accurate and complete is rebuttable, however.  For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record.  42 U.S.C. § 300aa-13(b)(2).  By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury.  In such cases, special masters are expected to consider whether medical records are accurate and complete.  To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling."  Blutstein v. Sec'y of Health &

4

Human Servs., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).

      In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony.  The Court of Federal Claims has identified four such explanations for explaining inconsistencies: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  La Londe v. Sec'y Health & Human Servs., 110 Fed. Cl. 184, 203 (2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).

      When weighing divergent pieces of evidence, special masters usually find contemporaneously written medical records to be more significant than oral testimony.  Cucuras, 993 F.2d at 1528.  Testimony offered after the events in question is less reliable than contemporaneous reports when the motivation for accurate explication of symptoms is more immediate.  Reusser v. Sec'y of Health & Human Servs., 28 Fed. Cl. 516, 523 (1993).   However, compelling oral testimony may be more persuasive than written records.  Campbell, 69 Fed. Cl. at 779 ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); Murphy v. Sec'y of Health & Human Servs., 23 Cl. Ct. 726, 733 (1991) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.") (citation omitted), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).

## **Discussion**

      The overarching factual determinations to be made are those relevant to establishing whether the flu vaccine caused Mr. Tutt's TM.  See Order, issued Feb. 21, 2018, ECF No. 61.  Based on the facts presented by petitioner, as well as the Secretary's objections, in the combined set of Proposed Findings of Fact, see Proposed Findings of Fact, the key factual issues relevant to this causation analysis are: (1) Mr. Tutt's pre-vaccination behavior and medical issues, including complaints, medical attention sought, and the extent to which Mr. Tutt's pre-

vaccination ailments appear chronic and/or continuous; (2) Mr. Tutt's pre-vaccination versus post-vaccination use of sick leave; (3) Mr. Tutt's health and behavior on two out-of-town trips after his vaccination; (4) Mr. Tutt's lack of reports of pain to medical professionals after his vaccination; and (5) the onset of Mr. Tutt's upper and lower extremity weakness after his vaccination.  The undersigned addresses each of these factual issues in turn.

### 1. Pre-Vaccination Behavior and Medical Issues

The parties dispute several points regarding Mr. Tutt's pre-vaccination medical history.  Mr. Tutt asserts that he never complained of ailments to his wife, Proposed Findings of Fact ¶ 4, and that while Mr. Tutt did seek chiropractic treatment during the years of 2007-2009, this was not indicative of a continuous or chronic issue.  See, e.g., id. ¶ 8(c) (describing chiropractic treatment as "on an as needed basis"), (e) (chiropractic appointments were "specific to symptoms that Mr. Tutt felt at that specific time" in 2007), (f) (stating that six chiropractic visits in one year is "not abnormal"), (j) (stating that Mr. Tutt's doctor "did distinguish" his 2008 symptoms from his 2007 symptoms), (m) (contending that his symptoms in 2009 "only began several weeks prior to his February 25, 2009 visit").  Mr. Tutt further asserted that he did not see a chiropractor for backache symptoms in 2010, see id. ¶ 8(p), and that his chiropractic visit in 2011 was solely related to "injuries sustained during the physical training connected to the job [that he applied for] with the police department" (i.e. wholly unconnected to the reasons for his prior visits), see id. ¶ 8(s).  The Secretary disputes both points, contending that Mr. Tutt sought chiropractic care in 2010, see id. ¶ 8(p), and that there was no testimony regarding injuries sustained as part of a police department job, see id. ¶ 8(s)..

The undersigned first finds that Mr. Tutt more likely than not did complain to his wife about ailments prior to his vaccination.  The dispute between petitioner and respondent on this point comes down to conflict between Mrs. Tutt's and Mr. Tutt's testimonies.  Compare Tr. 19 (Mrs. Tutt stating that Mr. Tutt "never" complained), with Tr. 119-20 (Mr. Tutt stating that he complained to his wife about "three to four times a year" about various ailments).  Though Mr. Tutt did not specify in his testimony whether he complained specifically about the medical issues from 2006-2009 referenced in the Proposed Findings of Fact, it is reasonable to find that his complaints would likely include references to these symptoms, given the frequency with which they occurred during those years and the treatment sought.

The undersigned finds that, while it is possible that Mr. Tutt visited a medical doctor more than once in 2006, any appointments were only for cancer treatment. See exhibit 3 at 1, 3, 10 (referencing his right radical nephrectomy performed in November 2006 and his "[h]istory of cancer in 2006"). Thus, the undersigned finds that Mr. Tutt did not see a doctor for purposes of treating back, neck, and/or shoulder pain as referenced heavily in the Proposed Findings of Fact in 2006.

Next, the undersigned finds that, due to the clear similarity in symptoms with respect to his reasons for seeking chiropractic treatment in 2007-2011, these conditions were continuous throughout this time period. The undersigned acknowledges that the severity of the symptoms likely ebbed and flowed, but the symptoms that persisted throughout this period were consistent. Mr. Tutt references multiple chiropractic trips during this period in the Proposed Findings of Fact. See Proposed Findings of Fact, ¶ 8(a)-(p). The chiropractor records support the 2007-2011 dates referenced by Mr. Tutt, including the statement that Mr. Tutt made "about 18 visits" to the chiropractor during this period. Tr. 220; see exhibit 72 at 1-7 (displaying notes from 19 separate visits between 2007-2011).[3] Many of the notations from these visits are handwritten and fairly illegible, except for those that are typed—December 23, 2010; May 3, 2011; September 22, 2011; October 26, 2011; and November 10, 2011. See exhibit 70 at 1-2. However, Dr. Denbign's testimony confirms, based on his reading of the handwritten notes, that the other appointments include notations such as "neck, upper back, pulling on the left side for several weeks," "[h]eadaches several weeks, neck is achy," and "neck stiff continues . . . occasional headaches." Tr. 245, 247. The undersigned agrees that, after 2007, Mr. Tutt's visits to the chiropractor seem to be on an as-needed basis in that they were not regularly scheduled appointments. Additionally, all the notes include complaints about back, neck, shoulder, and/or joint pain. See exhibit 70 at 1 ("scapular pain . . . shoulder girdle thoracic spine tight ache" on December 23, 2010); id. ("achey stiff . . . joint dysfunction trigger points shoulder girdle muscles right upper lower trapezius taught and tender" on May 3, 2011); id. ("neck achey stiff with headaches upper back tight" on September 22, 2011); id. at 2 ("upper back, neck achey stiff lumbar spine stiff" on October 26, 2011); id. ("achey stiff

---

[3] Though Mr. Tutt claims to have visited the chiropractor six times in 2007, see Proposed Findings of Fact ¶ 8(a), the medical records and hearing testimony show only one visit, which was on May 7, 2007. See exhibit 62 at 6-7 (patient intake form completed on May 7, 2007); Tr. 240. Thus, the undersigned finds that Mr. Tutt visited the chiropractor on May 7, 2007, with the "chief complaint" noted as "[n]eck/upper back pain" that had occurred "[o]n and off for 20 years." Exhibit 62 at 7.

started yesterday" on November 10, 2011); Exhibit 72 at 1-8 (displaying appointment notes from each of Mr. Tutt's chiropractic visits); see also Tr. 245, 247 (referencing visits on August 2008, February 2009, February 2010, and October 2010, in which symptoms were described as "neck, upper back, pulling on the left side for several weeks," "[h]eadaches several weeks, neck is achy," and "neck stiff continues . . . occasional headaches"). The consistent language of these complaints indicates that these were not separate issues with distinct causes. Furthermore, the lack of evidence, other than Mr. and Mrs. Tutt's testimonies, regarding the police boot camp as a cause for some of the 2011 symptoms, see Proposed Findings of Fact ¶ 8(r)-(s), further supports this conclusion. There is no indication in the medical records that Mr. Tutt reported this as a cause to his chiropractor, and the symptoms appear too similar to symptoms from 2007-2010 to suggest a different and distinct cause.

Mr. Tutt's medical records also confirm a gap in chiropractic care between his visits on November 10, 2011, and December 4, 2013. See generally exhibits 62, 70, 72. Mr. Tutt contends in the Proposed Findings of Fact that the pain about which he complained at his post-vaccination December 4, 2013 visit was the "most severe." Proposed Findings of Fact, ¶ 8(v) (citing Tr. 230). This is based on an interpretation by Dr. Denbign based on his comparison of the notes taken at different visits. See Tr. 230 ("Q. . . . [W]hich visit, from the subjective standpoint, [was] the most severe reporting of headache and neck pain . . . ? A. That would be the last visit in December 2013."). However, Dr. Denbign did not provide a detailed reason why this pain was more severe than his previous visits, other than the fact that he was "having pain for several weeks with headaches [and] taking a lot of Advil." Tr. 229.[4] Additionally, the medical records themselves do not indicate significantly more severe pain at this visit as compared to many weeks' worth of visits in, for example, 2011. Compare, e.g., exhibit 70 at 2 ("neck pain achey stiff with occasional headaches several weeks taking a lot of Advil" (December 4, 2013)), with id. at 1-2 ("last week tight CS and TS achey stiff" (May 3, 2011); "neck achey stiff with headaches upper back tight" (September 22, 2011); "upper back, neck achey stiff lumbar spine stiff" (October 26, 2011); "achey stiff started yesterday" (November 10, 2011)). While the undersigned credits Dr. Denbign's testimony, the undersigned also views the contemporaneously composed medical record notations as carrying more weight than Dr. Denbign's after-the-fact subjective interpretation of the relative severity

---

[4] The mention of Advil is unique to the December 4, 2013 visit. However, an over-the-counter medication is not a significant treatment.

8

based solely on his reading of the notes. The symptoms described at the December 4, 2013 appointment do not appear significantly "more severe" than those in prior years.

Thus, the undersigned finds the facts Mr. Tutt proposes regarding the appointment dates and symptoms reported at those appointments between 2007-2011 to be accurate. The undersigned finds that the similarity between symptoms reported at all chiropractic appointments—namely pain, stiffness, and aches, in the neck, back, shoulders, and/or head—indicate continuous physical issues that necessitated intermittent (though in some years, frequent) appointments to the chiropractor. In other words, the medical records do not indicate separate, unrelated medical issues as suggested by Mr. Tutt in the Proposed Findings of Fact, see Proposed Findings of Fact, ¶ 8(j), but instead, ongoing issues necessitating care. Finally, the undersigned finds there is insufficient evidence to indicate that the pain complained of post-vaccination, at the December 4, 2013 appointment, was significantly more severe than the pain about which Mr. Tutt had complained in earlier years.

### 2. Pre-Vaccination versus Post-Vaccination Use of Sick Leave

The parties further dispute the amount of sick leave Mr. Tutt tended to take before his vaccination, as well as how often he tended to work from home during that time. See Proposed Findings of Fact, ¶¶ 9, 12. The parties also disagree as to whether Mr. Tutt took sick leave after his vaccination. See id. ¶ 16.

While Mr. Tutt characterized that he "rarely" called in sick to work, id. ¶ 9, Mrs. Tutt testified that he did not call out "frequently." Tr. 22. She further stated, "The only thing I recall is that if he had, you know, a head cold or something he would try to do what he had to do for a short period and then take a half day or reschedule something and work around that." Tr. 22-23. His employment records confirm occasional sick leave taken in 2013 prior to his vaccination. See Exhibit 60 at 35 (showing a year-to-date sick leave total of 75 hours (assuming "SickMin" and "SickPO" are payroll codes for sick leave) on his last pay statement of 2013). Additionally, she testified that he performed a significant portion of his work at home before his vaccination. Tr. 23. Thus, contrary to Mr. Tutt's assertions in the Proposed Findings of Fact, the undersigned finds that Mr. Tutt seems to have taken a relatively normal amount of sick leave before his vaccination, and that it was common for him to work from home or out of the office.

The parties further disagree about whether Mr. Tutt missed work and took sick leave the week of Thanksgiving. Proposed Findings of Fact, ¶ 16. Though Mrs. Tutt testified that "[Mr. Tutt] was home and he took a couple of days, half days, not full days, off. He came home from work early on Thanksgiving," Tr. 26, Mr. Tutt's employment records show that he did not take sick leave during the pay period that included Thanksgiving week. See Exhibit 60 at 33. His pay statement for that pay period seems to indicate that he may have worked overtime on weeknights and weekends, as denoted by the codes "S2WkdyNt" and "S7WkndNt," (as opposed to "SickMin" and "SickPO," which show zero hours for that pay period). Id. Additionally, Mr. Tutt confirmed that he did not take sick leave after his vaccination. Tr. 131. Though Mrs. Tutt may honestly believe that Mr. Tutt was home more than usual after his vaccination, with the combined evidentiary weight of his employment and his own testimony, make it more likely than not that he did not take sick leave after his vaccination.

### 3. Petitioner's Behavior During Trips after Vaccination

The parties disagree over Mr. Tutt's behavior during the week of Thanksgiving. Proposed Findings of Fact, ¶¶ 17-19. Mrs. Tutt described Mr. Tutt during the week of Thanksgiving as "pale," "rubbing his shoulders," "taking naps frequently," having headaches, and exhibiting "low energy." Tr. 27-29. She additionally testified that he believed he was experiencing flu symptoms as a result of his vaccine. Tr. 37. Mr. Tutt testified to experiencing fatigue, as well as neck and upper back pain during the week of Thanksgiving and characterized this pain as "unusual." Tr. 121-22. He did not, however, testify to experiencing flu-like symptoms that week, or to verbally attributing any symptoms to his flu vaccine. See id. He also did not testify to having headaches during the week of Thanksgiving. See id. He did testify to experiencing a cough in the weeks following Thanksgiving week. Tr. 124. Thus, the undersigned credits the descriptions of Mr. Tutt's behavior that are consistent between the testimonies of Mr. and Mrs. Tutt—namely that he was experiencing fatigue, low energy, and neck and upper back pain that caused him to rub his shoulders.

The parties seem to agree for the most part on Mr. Tutt's characterization of his experiences during his trips to Aztec, NM; Pagosa Springs, CO; and San Diego, CA. See Proposed Findings of Fact, ¶¶ 23-30. Mrs. Tutt testified that he experienced increasing fatigue, coughing, and neck pain during this time, see Tr. 33, 36, 43-45, and did not partake in certain physical activities during the trips that he normally would have, see Tr. 299. Respondent did not dispute any of these contentions in the Proposed Findings of Fact. Therefore, the undersigned credits

10

Mrs. Tutt's testimony regarding Mr. Tutt's behavior during the weeks following his vaccination, and finds that Mr. Tutt experienced fatigue, coughing, and neck pain during the few weeks after Thanksgiving week in which he travelled to Aztec, Pagosa Springs, and San Diego.

### 4. Petitioner's Lack of Reporting Pain During Post-Vaccination Medical Appointments

The parties seem not to dispute respondent's contention that Mr. Tutt did not report his pain symptoms to the two medical providers he visited to treat an upper respiratory infection ("URI") after his vaccination.  See Proposed Findings of Fact, ¶¶ 34, 38.  His medical records confirm that there was no mention of his neck or upper back pain.  Mr. Tutt visited Dr. Melissa Martinez on January 13, 2014, seeking treatment for his URI.  See exhibit 4 at 497.  At this appointment, he complained of a runny nose, cough, and tightness in his chest, but did not mention any neck, shoulder, or back pain.  See id.  Mr. Tutt then visited a new primary care physician on January 20, 2014.  See id. at 471.  At this visit, he reported fatigue, mood symptoms, and anxiety, but did not mention any neck, shoulder, or back pain.  See id.  Based on the medical records and lack of objection by petitioner in the Proposed Findings of Fact, the undersigned finds that Mr. Tutt did not complain about neck, shoulder, or back pain to his medical providers during his first two post-vaccination medical visits on January 13, 2014, and January 20, 2014.

Furthermore, because Mr. Tutt did not report neck or upper back pain to two doctors in his January appointments, a reasonable inference is that Mr. Tutt was not experiencing neck or upper back pain from approximately January 1, 2014 through January 20, 2014.  As discussed above, appellate authorities have reasoned that if a person were experiencing symptoms, the person would seek treatment for those problems from a medical professional and the medical professional would create a record of the complaint.  When the medical record does not show a complaint, a special master may find that the person was not experiencing the symptom around the time of the medical appointment.  This logic fits Mr. Tutt's situation, especially for the January 20, 2014 visit to establish primary care.  In this initial visit, Mr. Tutt, presumably, was motivated to provide as complete and accurate a history as possible.  See Tr. 160-67, 207-08 (Mr. Tutt's testimony about this visit).

### 5. Onset of Petitioner's Upper and Lower Extremity Weakness

Finally, the parties seem not to dispute respondent's contention in the Proposed Findings of Fact that "[t]he onset of Mr. Tutt's upper and lower extremity weakness occurred over a 24-hour period from January 21-22, 2014." Proposed Findings of Fact ¶ 43.  The medical records seem to confirm this onset.  He visited the emergency department on January 22, 2014, at which visit the attending doctor noted "neck pain" and "3/5 bilateral upper and 2/5 bilateral lower extremities," as well as a diagnosis of "weakness."  Exhibit 5 at 253.  Therefore, given the lack of complaints of these type at his medical appointment on January 20, 2014, see supra Part 4, it is reasonable to conclude that the onset of his upper and lower extremity weakness occurred between the January 20 visit and the January 22 visit to the emergency department (i.e. between January 21-22, 2014).  Therefore, based on Mr. Tutt's medical records and the lack of objection by petitioner in the Proposed Findings of Fact, the undersigned finds that the onset of Mr. Tutt's upper and lower extremity weakness occurred between January 21-22, 2014.

### Conclusion

For the reasons explained above, the undersigned finds that:

(1) Mr. Tutt's medical records indicate continuous issues with neck, back, shoulder, and/or headache pain that necessitated intermittent, but frequent, visits to the chiropractor between 2007-2011;
(2) Mr. Tutt did not visit the chiropractor between his visits on November 10, 2011, and December 4, 2013;
(3) the pain complained of at his post-vaccination, December 4, 2013 chiropractor visit was not significantly more severe than the pain in his prior visits;
(4) Mr. Tutt took a reasonable amount of sick leave before his vaccination and did not take sick leave after his vaccination;
(5) Mr. Tutt experienced fatigue, low energy, and neck and upper back pain during Thanksgiving week, and continued to experience these symptoms along with a developing cough in the weeks following Thanksgiving;
(6) Mr. Tutt did not complain about neck, shoulder, or back pain to his medical providers during his first two post-vaccination medical visits on January 13, 2014, and January 20, 2014.  Therefore, he was not experiencing neck, shoulder, or back pain from January 1, 2014 through January 20, 2014; and

 (7) the onset of Mr. Tutt's upper and lower extremity weakness occurred between January 21-22, 2014.

The parties are ordered to provide this ruling to any expert they retain or have retained. If the expert's opinion is not consistent with these findings of fact, the opinion is likely to not be persuasive. See Burns v. Sec'y of Health & Human Servs., 3 F.3d 415, 417 (1993) (holding that the special master did not abuse his discretion in refraining from conducting a hearing when the petitioner's expert "based his opinion on facts not substantiated by the record.").

 A status conference is set for **Tuesday, February 25, 2020, at 2:00 PM Eastern Time**. Mr. Tutt should be prepared to propose the next step in this case.

 **IT IS SO ORDERED.**

              s/Christian J. Moran
              Christian J. Moran
              Special Master