# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

| | |
|---|---|
| DAVID TUTT, as personal representative of the Estate of THOMAS TUTT, deceased, | No. 16-385V |
| Petitioner, | Special Master Christian J. Moran |
| v. | Filed: July 31, 2026 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

Amber Wilson, Wilson Science Law, Washington, DC, for petitioner;
Mitchell Jones, Nina Ren, and Mia Guglielmi, United States Dep't of Justice, Washington, DC, for respondent.

## DECISION DENYING COMPENSATION[1]

Thomas Tutt received an influenza ("flu") vaccine on November 14, 2013, and was diagnosed as suffering from a neurologic disorder, transverse myelitis, manifesting on January 21, 2014. Mr. Tutt alleged that the flu vaccine caused his transverse myelitis and sought compensation through the National Childhood Vaccine Injury Compensation Program, 42 U.S.C. § 300aa–10 through 34 (2012). While the litigation was pending, Mr. Tutt, unfortunately, passed away. The administrator of his estate, David Tutt, has maintained the claim.[2]

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material before posting the decision.

[2] In this Decision, "Mr. Tutt" is Thomas Tutt and "petitioner" is David Tutt.

In support of the claim, petitioner retained three experts. The first is James Norris, who is a toxicologist. The second is a neurologist, Sidney Kurn. The third is another neurologist, Enrique Aradillas. Petitioner also advocated through briefs.

The Secretary opposes an award of compensation. The Secretary retained two experts. The first is a neurologist, David Alexander. The second, for reasons explained below, is another neurologist, Robert Naismith. The Secretary defended his position through briefs.

The case proceeded to an entitlement hearing, which was held on July 23, 2026. Only Dr. Aradillas and Dr. Naismith testified. With the conclusion of the hearing, the case is ready for adjudication.

## I. Events in Thomas Tutt's Life[3]

### A. Before the November 14, 2013 Vaccination

Thomas Tutt was born in 1959. He worked as a case manager in the University of New Mexico Hospital Children's Psychiatric Unit. In 2013, he occasionally used sick leave. Exhibit 60 at 35. He also worked at home.

Between 2007 and 2011, Mr. Tutt experienced problems with headaches and neck, back, and shoulder pain, for which he sought treatment from a chiropractor, Robert S. Denbign. These problems were intermittent but frequent. Before 2013, the most recent visit with a chiropractor was on November 10, 2011. See Exhibits 70 and 72.

### B. November 2013, including Vaccination

Mr. Tutt received the flu vaccination on November 14, 2013.

Thanksgiving in 2013 was November 28. Mr. Tutt did not take sick leave around Thanksgiving and seems to have worked overtime and on weekends. See Exhibit 60 at 33. However, around this time, Mr. Tutt experienced fatigue, low energy, and neck and upper back pain that caused him to rub his shoulders.

After Thanksgiving, Mr. Tutt drove his mother to Aztec, New Mexico, and on the return trip he stayed in Pagosa Springs, Colorado. He experienced fatigue, coughing, and neck pain during this trip.

### C. December 2013

On December 4, 2013, Mr. Tutt sought treatment from his chiropractor, Dr. Denbign, for the first time in about two years. The complaint reads: "neck pain achey stiff with occasional headaches [for] several weeks taking a lot of Advil." Exhibit 70 at 2. This pain was not meaningfully different from the pain for which he previously sought treatment. See id., appointments from Oct. 26, 2011 (complaint regarding "upper back, achey stiff lumbar spine

[3] This summary of events draws upon an Unpublished Ruling Finding Facts, issued February 3, 2020.

stiff") and Nov. 10, 2011 (complaint of "achey stiff started yesterday ts [thoracic spine] cs [cervical spine]").

### D. January 2014, including Hospitalization

From January 5, 2014 through January 12, 2014, Mr. Tutt and his wife visited their son in San Diego, California. Mr. Tutt had a cough and suffered from an upper respiratory infection ("URI") or sinus infection during this trip.

On January 13, 2014, Mr. Tutt sought care from a doctor at UNM LoboCare, Melissa Martinez. He complained of a runny nose, cough, and "a little bit of tightness in his chest," but did not mention any neck, shoulder, or back pain. Exhibit 4 at 703. He reported that the runny nose and cough had started three days prior. Id. Dr. Martinez assessed Mr. Tutt as having an upper respiratory infection and advised him to get fluids, humidity, and rest and to return to the clinic as needed. Id. at 704. She also prescribed Tessalon and refilled his albuterol. Id.

One week later, on January 20, 2014, Mr. Tutt went to the Family Practice at UNMH to establish primary care. He was recovering from an upper respiratory infection. He did not complain about any neck, shoulder, or back pain. Exhibit 4 at 677-79.

Beginning on January 21, 2014, Mr. Tutt developed upper and lower extremity weakness that progressed over the next 24 hours. January 21, 2014 is 68 days after November 14, 2013, which is the date of vaccination.[4] The testifying experts, Dr. Aradillas and Dr. Naismith, agreed that the onset of Mr. Tutt's transverse myelitis was January 21, 2014.[5]

Mr. Tutt was admitted to UNMH. There, he was diagnosed as suffering from transverse myelitis.

### E. Health after January 2014

The course of Mr. Tutt's transverse myelitis, unfortunately, was relatively severe, requiring intubation and a gastrostomy tube. The specific details about the course of Mr. Tutt's transverse myelitis provide relatively little, if any, information about the cause of the transverse myelitis. See Pet'r's Br., filed Aug. 28, 2023, at 4 (summarizing all relevant medical facts in about one paragraph).

---

[4] The parties refer to both a 68-day and 69-day onset.

[5] As discussed in the procedural history below, petitioner's experts sometimes asserted that Mr. Tutt developed prodromal transverse myelitis symptoms around Thanksgiving 2013. See Exhibits 23 at 8, 13 (Dr. Kurn) and 81 at 3, 8-9 (Dr. Aradillas). The Secretary's experts easily defeated the assertion that transverse myelitis can present with prodromal symptoms. Exhibit H at 3-5 (Dr. Alexander); Exhibit I at 4 (Dr. Naismith). At the hearing, petitioner's testifying expert agreed that Mr. Tutt's transverse myelitis began on January 21, 2024. In light of this concession, extensive discussion about prodromes is unnecessary. See Pet'r's Br. at 15 (recognizing that petitioner's experts are not relying upon non-specific symptoms as prodromal for transverse myelitis).

Mr. Tutt passed away on November 25, 2018, see Pet'r's Status Rep., filed Mar. 21, 2019, ¶ 1, and his son, David Tutt, became the personal representative of his estate and was substituted as petitioner in the case on August 20, 2019, see Order, issued Aug. 20, 2019.

## II. Procedural History

### A. Petition to Ruling Finding Facts, including Initial Set of Expert Reports

Represented by Attorney Karen Ross, Thomas Tutt started this litigation by filing a petition on March 25, 2016. With his petition, Mr. Tutt submitted an extensive set of medical records.

Mr. Tutt also filed an affidavit. In his affidavit, he averred that he had neck pains on Wednesday, November 27, 2013. Exhibit 17, ¶ 4. With the petition, Mr. Tutt presented a report from Dr. James C. Norris.

Dr. Norris earned a Ph.D. in pharmacology / toxicology in 1983. He is not a medical doctor. Exhibit 19 (curriculum vitae).

Dr. Norris's report is approximately six double-spaced pages with additional pages for references. Approximately four of these pages are devoted to summarizing Mr. Tutt's medical records and describing transverse myelitis. Dr. Norris recognized that the "time between his vaccination and the TM onset was 69 days." Exhibit 18 at 5. Dr. Norris proposed that this interval is appropriate because the Court of Federal Claims accepted longer latencies in Jane Doe 93 and John Doe 93. Dr. Norris, however, did not present any theory to explain how the flu vaccine can cause transverse myelitis. Dr. Norris concluded that "Mr. Tutt's influenza vaccination is the most plausible explanation and thus is highly likely to be the cause of his transverse myelitis." Id. at 6.

The Secretary disputed Mr. Tutt's claim. The Secretary maintained that 69 days between vaccination and onset of transverse myelitis was not appropriate. The Secretary also identified an upper respiratory infection diagnosed on January 13, 2014 but beginning about 3 days before, approximately 11 days prior to the onset of Mr. Tutt's transverse myelitis, as a potential alternative cause of the transverse myelitis. See Resp't's Rep., filed Aug. 2, 2016, at 2-3, 6-7.

In conjunction with his report, the Secretary also submitted a report from Dr. Alexander. Dr. Alexander graduated medical school in 1979, and became board-certified in neurology and psychiatry in 1985. Exhibit B (curriculum vitae).

Dr. Alexander's report is approximately nine single-spaced pages. He agreed with the diagnosis of transverse myelitis, placing the onset in "late January of 2014." Exhibit A at 5. Dr. Alexander viewed the upper respiratory infection as causing Mr. Tutt's transverse myelitis. Id. at 6. Based upon the Institute of Medicine, Dr. Alexander disputed whether the flu vaccine can cause transverse myelitis.

Because the Secretary had retained a neurologist, Mr. Tutt also wanted to retain a neurologist. Order, issued Oct. 31, 2016; Pet'r's Status Rep., filed Jan. 3, 2017. This neurologist was Dr. Kurn.

Dr. Kurn graduated from medical school in 1975. He became board-certified in neurology in 1982. Exhibit 24 (curriculum vitae).

Dr. Kurn's first report is 15 single-spaced pages with an additional page listing six references, of which one is a special master's decision in Schmidt v. Sec'y of Health & Hum. Servs., No. 07-20 (Fed. Cl. Spec. Mstr. Dec. 17, 2009). Dr. Kurn based his recitation of Mr. Tutt's medical history upon Mr. Tutt's affidavit as well as three conversations between Dr. Kurn and Mr. Tutt. Exhibit 23 at 3. Like Dr. Alexander, Dr. Kurn stated that Mr. Tutt suffered from transverse myelitis. Id. at 8. Unlike Dr. Alexander, Dr. Kurn placed the onset of the transverse myelitis nine days after vaccination, when Mr. Tutt started having symptoms Dr. Kurn characterized as prodromal. Id. Dr. Kurn also disagreed with Dr. Alexander's contention regarding a possible causal relationship between the flu vaccine and transverse myelitis. Dr. Kurn maintained that the flu vaccine can cause transverse myelitis. Id. at 9-15. Dr. Kurn stated that molecular mimicry is a "theoretical possibility" for how the flu vaccine can cause transverse myelitis. As for the intervening upper respiratory infection, Dr. Kurn proposed that the upper respiratory infection "may have played a role in amplifying the immunologic mechanisms which resulted in the 'full-blown' transverse myelitis." Id. at 15.

One day after Mr. Tutt filed the report from Dr. Kurn, Mr. Tutt added a second report from Dr. Norris. This report is approximately 11 double-spaced pages with additional pages for a list of references. Dr. Norris primarily challenged Dr. Alexander's opinion that an upper respiratory infection caused Mr. Tutt's transverse myelitis. Exhibit 25.

Dr. Alexander responded in an approximately seven-page, single-spaced report. Dr. Alexander mostly discussed various case reports that Dr. Kurn and Dr. Norris had cited. Exhibit G, dated June 4, 2017.

Thus, between Dr. Kurn and Dr. Alexander, the experts had a dispute about the onset of Mr. Tutt's transverse myelitis. Part of that dispute was based upon different assumptions as to whether Mr. Tutt had neck and back pain in November 2013. Thus, to resolve this dispute, a hearing to receive testimony from percipient witnesses was planned for February 15, 2018. Order, issued Nov. 22, 2017.

Mr. Tutt was directed to develop evidence about his health from November 2013 through January 2014. Mr. Tutt submitted, among other documents, records from chiropractor visits at Albuquerque Neck & Back Pain Center that spanned from December 23, 2010, to November 10, 2011. See Exhibit 62 (filed Oct. 19, 2017) at 1-2. However, the handwriting in many of these records was not legible and Mr. Tutt was directed to obtain a transcription. At the pre-hearing conference on February 6, 2018, a transcription of the chiropractor's records remained outstanding. See Order, issued Feb. 8, 2018. The following day, Mr. Tutt filed supplemental records from Albuquerque Neck & Back Pain Center, which included notes from an additional December 4, 2013 visit. See Exhibit 70 at 2. Because these supplemental records revealed that Mr. Tutt had sought chiropractic care in the critical time (after the November 2013 flu vaccination and before the January 2014 hospitalization), the undersigned wanted the chiropractor to testify. Order, issued Feb. 8, 2018.

The hearing was held as scheduled on February 15, 2018, in Albuquerque, New Mexico. Seven witnesses, including Mr. Tutt, testified. Mr. Tutt's chiropractor, Dr. Denbign, also

testified. Dr. Denbign brought his complete file to the witness stand and, in doing so, produced records that had not been previously filed. Tr. 230-31. These additional records included documentation from visits in 2007-2009, and were later filed by Mr. Tutt's counsel on March 14, 2018. See Exhibit 72, filed Mar. 14, 2018.

Mr. Tutt passed away on November 25, 2018, see Pet'r's Status Rep., filed Mar. 21, 2019, ¶ 1, and his son, David Tutt, became the personal representative of his estate and was substituted as petitioner in the case on August 20, 2019, see Order, issued Aug. 20, 2019, ECF No. 91.

Adjudication after the hearing was delayed largely because Ms. Ross was suspended from practicing law for a time. Eventually, the parties jointly submitted proposed findings of fact.

### B. Ruling Finding Facts

The undersigned weighed the documentary and testimonial evidence regarding Mr. Tutt's health. A complete discussion is found in the Findings of Fact, issued Feb. 3, 2020.

The crux of the Findings of Fact is that preponderant evidence did not establish that Mr. Tutt suffered from any significant back or neck pain between his vaccination and January 20, 2014. Although Mr. Tutt saw his chiropractor on December 4, 2013, the complaints and treatment were in line with Mr. Tutt's previous complaints and chiropractic treatments.

Petitioner was directed to submit expert reports that conformed to the Findings of Fact.

### C. Second Set of Expert Reports

Petitioner submitted another report from Dr. Kurn. Exhibit 83, dated July 24, 2020.[6] This report is approximately seven single-spaced pages. Dr. Kurn explicitly disagreed with some of the undersigned's findings of fact. Exhibit 83 ¶ 7. Dr. Kurn also declared that Mr. Tutt's shoulder pain "waxed and waned" from approximately Thanksgiving until January 21, 2014. Id. ¶ 8.

To explain how the flu vaccine can cause transverse myelitis, Dr. Kurn again proposed molecular mimicry. Exhibit 83 ¶ 8. He also wrote: "There are other immunologic mechanisms which are known to occur creating causality between vaccination and tissue injury, although the technicality of their description makes their inclusion in this report unnecessarily cumbersome." Id.

This report was discussed during an August 3, 2020 status conference. A primary topic was Dr. Kurn's failure to conform his opinion to the findings of fact.

Dr. Kurn wrote another report, dated Nov. 2, 2020. Exhibit 84. In this approximately six-page single-spaced report, Dr. Kurn expanded his discussion of molecular mimicry. He

[6] Petitioner did not always label exhibits properly, and so some exhibits had to be struck and refiled.

proposed that "the innate immune system's response to [Mr. Tutt's] URI exacerbated the adverse immunologic process initiated by the influenza vaccine." Id. at 5.

Another status conference was held on December 10, 2020. The undersigned pointed out that both Dr. Kurn and Dr. Alexander are neurologists and, therefore, their expertise on immunologic topics like molecular mimicry might be uncertain. On behalf of the petitioner, Attorney Ross planned to seek a report from an immunologist. Order, issued Dec. 10, 2020.

In October 2021, Attorney Amber Wilson replaced Ms. Ross as counsel of record for petitioner.[7] Ms. Wilson has represented Mr. Tutt's estate ever since.

As counsel of record for petitioner, Ms. Wilson obtained a report from Dr. Aradillas. Dr. Aradillas earned his medical degree in 2003 and became board-certified in neurology in 2011. Within the field of neurology, Dr. Aradillas has subspecialized in pain management, including research on complex regional pain syndrome. Exhibit 82 (curriculum vitae).

Dr. Aradillas's first report is approximately 15 single-spaced pages. Exhibit 81.[8] Part of this report is a defense of Dr. Kurn's opinions. See id. at 3.[9] Dr. Aradillas recognized that Mr. Tutt suffered a flare of neck pain for which he sought chiropractic care in the weeks after the vaccination, but that Mr. Tutt experienced a different type of pain when he experienced transverse myelitis in January 2014. Id. at 7.

Dr. Aradillas stated that "Mr. Tutt's influenza vaccine in mid-November 2013 initiated a primary immune response to the included viral proteins." Id. at 7. Based upon a chapter from Plotkin's Vaccines, Dr. Aradillas asserted that antibodies in response to the flu vaccine are produced within 1-2 weeks after the vaccination, generally peaking around 30 days. Id. at 8. Dr. Aradillas asserted that these antibodies "can last for months after immunization." Id.

As to how the flu vaccine could cause transverse myelitis, Dr. Aradillas wrote:

> Dr. Kurn in his opinion provides a very detailed and specific scientific analysis of how the multiple known molecular biological theories could have been involved in Mr. Tutt's immune dysfunction considering the medical picture of his individual case. He discusses specific potential mimicry identified between the influenza

---

[7] Before Ms. Ross exited the case, she submitted a motion requesting an award of attorneys' fees and costs. An Interim Fees Decision, 2022 WL 501178, issued Mar. 18, 2022, awarded a reasonable amount of fees and largely deferred an award of costs.

[8] It bears repeating that due to Attorney Ross's errors in labeling exhibits, two of Dr. Kurns reports are labeled Exhibits 83 and 84. Although 83 and 84 come after 81, Dr. Kurns wrote the reports that are labeled Exhibit 83 and 84 before Dr. Aradillas wrote the report labeled Exhibit 81.

[9] Dr. Aradillas's report would have been enhanced if he had cited the evidence underlying his opinions by exhibit number and page number.

> proteins and myelin, although the exact antigenic target in acute TM is still not scientifically definite.

Id. at 10.

Dr. Aradillas next tied the immune system's response to the flu vaccine to the intervening upper respiratory infection:

> There is little certainty that either one of the inflammatory triggers, the flu vaccine or the subsequent URI, present in Mr. Tutt's case alone would have resulted in breakdown of self-tolerance required to cause onset of clinical disease. However, the close timing of immune stimulation in the correct lowgrade chronic inflammatory setting can act as constant or repetitive activation of the immune system resulting in excessive inflammation. This excessive, repetitive activation of the immune system mechanistically increases individual risk of creating the adverse molecular microenvironment to dysregulate.

Id. at 11.

Dr. Aradillas also highlighted several case reports and case series, which other experts had previously identified. He described this type of literature as "patient medical stories . . . rather than controlled research studies where the patients are chosen for conformity of sample." Id. at 13.

The Secretary submitted another report from Dr. Alexander, dated Sep. 12, 2022.[10] In this five-paged single-spaced report, Dr. Alexander primarily responds to the report from Dr. Aradillas. Dr. Alexander summarizes Dr. Aradillas's opinion as "a minor adverse reaction to the flu vaccine somehow (unexplained specifically how) caused ATM [acute transverse myelitis]." Exhibit H at 4. In Dr. Alexander's view, Dr. Aradillas "provided no substantive causal linkage" for this opinion. Id. at 5 ¶ 3.2.

Dr. Aradillas responded in a two-page double-spaced report, dated December 16, 2022. Dr. Alexander maintained that a medically acceptable interval between vaccination and the onset of a neurologic condition can extend beyond six weeks when "the immune response is exacerbated by a subsequent infection." Exhibit 97 at 1. Dr. Aradillas supported his opinion by adding articles by Schonberger and Mealy.[11]

---

[10] This September 12, 2022 report is labeled Exhibit G, which repeats the letter assigned to Dr. Alexander's June 4, 2017 report. Thus, the September 12, 2022 report is cited as "Exhibit H" here.

[11] Lawrence B. Schonberger et al., Guillain-Barre syndrome following vaccination in the National Influenza Immunization Program, United States, 1976 – 1977, 110 AM. J. EPIDEMIOL. 105 (1979). Filed as Exhibit 99.

This appeared to complete the submission of expert reports. See Resp't's Status Rep., filed Apr. 28, 2023.

### D. First Round of Briefing and Substitution of An Expert

Because it appeared that the parties had finished disclosing opinions from experts, they were directed to argue their positions through briefs. Order, issued May 23, 2023. This process took longer than expected as the parties also explored an informal resolution. See Pet'r's Mot. to Amend Briefing Schedule, filed July 24, 2023; Resp't's Mot. for Enlargement of Time, filed Oct. 27, 2023; Order, issued Feb. 20, 2024.

Petitioner argued that Mr. Tutt's estate was entitled to compensation. Pet'r's Br., filed Aug. 28, 2023. Relying, in part, on opinions from Dr. Alexander, petitioner argued that transverse myelitis can be triggered by something that stimulates the immune system, such as an infection. Id. at 17. Petitioner further argued that Mr. Tutt's transverse myelitis "could be the result of cross-reactive autoantibodies becoming pathologic, or in other words 'losing their immune tolerance.'" Id. at 17-18, citing Exhibit 81 (Dr. Aradillas's report) at 11. In petitioner's assessment, the upper respiratory infection added a second stimulant to Mr. Tutt's immune system and "the combination of the two environmental triggers can dysregulate the already present, circulating immune response." Id. at 19-20. With respect to the appropriate temporal interval, petitioner argued: "Because the nonspecific infection in Mr. Tutt's case is postulated to have a secondary 'adjuvant' or 'acceleration' effect, this can scientifically explain the longer interval of Mr. Tutt's medically appropriate timing." Id. at 23.

The Secretary maintained that compensation was not appropriate. Resp't's Br., filed Apr. 30, 2024. He argued that because nearly 69 days had passed from the vaccination to the onset of Mr. Tutt's transverse myelitis, the interval was not appropriate for inferring causation. Id. at 7-8. The Secretary also contended that various case reports did not support petitioner's causal claim. Id. at 9-13. Finally, based on the opinions of Dr. Alexander, the Secretary argued that petitioner failed to meet his Althen prong two burden because of the intervening upper respiratory infection. Id. at 15-16.

Petitioner defended the request for compensation. Pet'r's Reply, filed May 30, 2024. From petitioner's perspective, a key difference between Dr. Aradillas's opinions and Dr. Alexander's opinions is the role of the intervening upper respiratory infection. See, e.g., id. at 9.

Following submission of petitioner's Reply, the parties were instructed to prepare for a hearing. Order, issued Oct. 24, 2024. As part of the process to plan for a hearing, a status conference was held on December 9, 2024. The Secretary announced that Dr. Alexander could not attend a hearing.

---

Maureen A. Mealy et al., Vaccines and the association with relapses in patients with neuromyelitis optica spectrum disorder, 23 MULT. SCLER. RELAT. DISORD. 78 (2018). Filed as Exhibit 98.

The Secretary formalized his request that he be permitted to substitute a different expert for Dr. Alexander through a motion filed January 24, 2025. However, this motion was not adequate. Order, issued Jan. 30, 2025. The Secretary presented more developed arguments in an amended motion, filed February 12, 2025. Petitioner opposed this motion. Pet'r's Resp., filed Feb. 26, 2025.

The Secretary was permitted to submit a report from a new expert. Order, issued Apr. 22, 2025, 2025 WL 5080718. The basic reason was that petitioner would not be prejudiced because a hearing had not actually been scheduled and because petitioner would have an opportunity to respond. Id. at *3.

**E. Third Set of Expert Reports**

After being authorized to submit another report from an expert, the Secretary presented Dr. Naismith. Dr. Naismith graduated from medical school in 1998. He became board-certified in psychiatry and neurology in 2014. Within the field of neurology, Dr. Naismith has special expertise in multiple sclerosis. Exhibit J (curriculum vitae).

Dr. Naismith's first report is approximately six single-spaced pages. He opined that Mr. Tutt's neck and back discomfort in November and early December was not a prodromal presentation of transverse myelitis. Exhibit I at 2. Dr. Naismith disputed whether the flu vaccine can cause transverse myelitis and cited three epidemiological studies in support of his position: Beghi, Shi, and Baxter.[12] Id. at 3. Dr. Naismith also analogized transverse myelitis to multiple sclerosis and stated that flu vaccine is safe to use in patients with multiple sclerosis. Id. at 5. As to timing, Dr. Naismith asserted that the expected time between an infectious trigger and autoimmune complications is "typically 7-21 days." In his view, "this window cannot be expanded by one or more additional antecedent events, such as an URI, to reset the clock." Id. at 5. In Dr. Naismith's opinion, "the infectious symptoms provide better timing as an antecedent etiology, with petitioner's URI diagnosed formally in January." Id. at 6.

Dr. Aradillas's next report, which is dated October 24, 2025, responded to Dr. Naismith. Exhibit 100. Dr. Aradillas wrote that Dr. Naismith and he "agree that Mr. Tutt did not suffer from TM-related neurological symptoms prior to January 21, 2014." Id. at 1. Dr. Aradillas clarified that he was using the term "prodrome" to describe that Mr. Tutt "suffered from systemic symptoms" from November 26, 2013 to January 13, 2014. Id. at 4.

---

[12] Ettore Beghi et al., Incidence of Acute Transverse Myelitis in Rochester, Minnesota, 1970-1980, and Implications with Respect to Influenza Vaccine, 1 NEUROEPIDEMIOLOGY 176 (1982). Filed as Exhibit L.

Xiangyu Chianti Shi et al., Assessment of potential adverse events following the 2022-2023 seasonal influenza vaccines among U.S. adults aged 65 years and older, 42 VACCINE 3486 (2024). Filed as Exhibit I, Tab 3.

Roger Baxter et al., Acute Demyelinating Events Following Vaccines: A Case-Centered Analysis, 63 CLIN. INFECT. DIS. 1456 (2016). Filed in author manuscript form as Exhibit I, Tab 4.

Dr. Aradillas further proposed there were three potential causes for Mr. Tutt's transverse myelitis: either (1) the flu vaccine, or (2) the non-specific infection, or (3) a combination of the flu vaccine and the non-specific infection. Id. at 1. Dr. Aradillas elaborated on why the third alternative, a combination, was the best explanation.

Dr. Aradillas also addressed epidemiologic studies. Part of this discussion repeated his reliance on case reports. Id. at 5-7.

In a December 2, 2025 status conference, Attorney Wilson stated that she wanted to submit an article published in June 2025 that Dr. Aradillas would discuss. Thus, a schedule was set so that Dr. Aradillas would write another report before Dr. Naismith responded.

Dr. Aradillas's next report is essentially one page. Exhibit 103. It discusses an article by Lee that draws upon information contained in the World Health Organization's pharmacovigilance database.[13]

Dr. Naismith's final report is three pages. He responded to the two most recent reports by Dr. Aradillas. Exhibit K. This report concluded the disclosure of written expert opinions.

### F. Summary of Expert Reports and Significant Filings

| Author | Report date | Item | Party | Summary |
|---|---|---|---|---|
| Norris, pharmacologist | 3/20/2016 | Ex.18 | P1 | Citing Doe 93. |
| Alexander, neurologist | 9/16/2016 | Ex. A | R1 | Onset of transverse myelitis was in late Jan. 2014, too late for flu vaccine to have been the cause. Infection caused transverse myelitis. |
| Kurn, neurologist | 2/4/2017 | Ex. 23 | P2 | Drew upon interview with Mr. Tutt. Onset of transverse myelitis was prodromal. |
| Norris | 3/3/2017 | Ex. 25 | P3 | Challenge to assertion that infection caused transverse myelitis. |
| Alexander | 6/4/2017 | Ex. C | R2 | Case reports. |
| Special Master | 2/3/2020 | Ruling Finding Facts | | |
| Kurn | 7/24/2020 | Ex. 83 | P4 | Pain "waxed and waned" starting around Thanksgiving. |

[13] Jae E. Lee et al., Global and Regional Burden of Vaccine-Associated Transverse Myelitis and Potentially Associated With Vaccines From 1967 to 2023: An Analysis of the International Pharmacovigilance Data, 97 J. MED. VIROL. 1 (2025). Filed as Exhibit 104.

| Author | Report date | Item | Party | Summary |
|---|---|---|---|---|
| Kurn | 11/2/2020 | Ex. 84 | P5 | URI exacerbated process that started with flu vaccine. |
| Aradillas | 3/17/2022 | Ex. 81 | P6 | Antibodies from flu vaccine last multiple months. Upper respiratory infection dysregulates these antibodies. |
| Alexander | 9/12/2022 | Ex. H | R3 | Dr. Aradillas failed to support his theory. |
| Aradillas | 12/16/2022 | Ex. 97 | P7 | Infections can extend the medically acceptable interval. |
| Petitioner | 9/28/2023 | Entitlement Brief | | |
| Respondent | 4/30/2024 | Entitlement Brief | | |
| Petitioner | 5/30/2024 | Reply | | |
| Naismith | 8/1/2025 | Ex. I | R4 | Epidemiology; Dispute whether URI can change the temporal window. |
| Aradillas | 10/24/2024 | Ex. 100 | P8 | Combination of flu vaccine and URI is the best explanation for the cause of transverse myelitis. |
| Aradillas | 12/11/2025 | Ex. 103 | P9 | Lee article. |
| Naismith | 2/17/2026 | Ex. K | R5 | Response to Lee article. |

### G. Second Round of Briefing

The parties expressed an interest in updating the arguments made in their briefs. Petitioner filed a supplemental brief on May 20, 2026. The Secretary filed a supplemental brief on June 17, 2026. Both focused on the Lee article, although both briefs discussed other topics as well.

### H. Preparation for Hearing and Hearing

In advance of the hearing, the parties were directed to address various logistical matters. Orders, issued June 22, 2026 and June 29, 2026. They did so. Pet'r's Status Rep., filed July 1, 2026 and Resp't's Status Rep., filed July 1, 2026.

A hearing was held on July 23, 2026. Dr. Aradillas and Dr. Naismith testified. The completion of their testimony makes the case ready for adjudication.[14]

## III. Standards for Adjudication

Petitioners are required to establish their case by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

Distinguishing between "preponderant evidence" and "medical certainty" is important because a special master should not impose an evidentiary burden that is too high. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing special master's decision that petitioners were not entitled to compensation); see also Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d 1357 (Fed. Cir. 2000); Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (disagreeing with dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

## IV. Elements of a Claim

The Vaccine Act requires that petitioners establish five elements. 42 U.S.C. § 300aa–11(c)(1)(A) through (E). Here, the dispute concerns the third element, causation. To establish causation, petitioners may rely upon the Vaccine Injury Table, which establishes a presumption of causation for certain vaccine-injury combinations. However, petitioner has not submitted an on-Table claim. Thus, he is necessarily pursuing an off-Table claim. For off-Table cases, petitioners bear a burden "to show by preponderant evidence that the vaccination brought about [the vaccinee's] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005).

## V. Analysis Part One: Qualifications

Special masters may consider the relative expertise of testifying experts when weighing the value of their opinion. See Depena v. Sec'y of Health & Hum. Servs., No. 13-675V, 2017 WL 1075101 (Fed. Cl. Spec. Mstr. Feb. 22, 2017), mot. for rev. denied, 133 Fed. Cl. 535, 547-48 (2017), aff'd without op., 730 Fed. App'x 938 (Fed. Cir. 2018); Copenhaver v. Sec'y of Health & Hum. Servs., No. 13-1002V, 2016 WL 3456436 (Fed. Cl. Spec. Mstr. May 31, 2016), mot. for rev. denied, 129 Fed. Cl. 176 (2016).

---

[14] At the time of filing this decision, the transcript from the July 23, 2026 hearing has not been completed. Therefore, the decision does not cite to the transcript. Nonetheless, the testimony presented at the hearing has been considered.

Here, the parties retained experts who do not have special training in the fields most relevant to topics on which they opined, which are immunology and infectious diseases. Instead, as discussed above, the parties retained neurologists. For purposes of Mr. Tutt's care, neurology was very important as neurologists cared for him when he suffered from transverse myelitis. However, in the litigation, the parties agreed on diagnosis. Thus, the neurologic aspects of the case were not disputed.

Instead, the parties disagreed over how the immune system responds to vaccinations and how Mr. Tutt's non-specific upper respiratory infection contributed to his transverse myelitis. Presentation of opinions from doctors with more expertise in these fields might have been advisable. See Dean v. Sec'y of Health & Hum. Servs., No. 13-808V, 2017 WL 2926605, at *8 n.7, *18 n.12 (Fed. Cl. Spec. Mstr. June 9, 2017) (indicating a lack of expertise from experts retained by both parties on an issue tends to hurt petitioner's case more because the petitioner bears the burden of proof).

With respect to the parties' primary retained experts, Dr. Naismith was more qualified than Dr. Aradillas to discuss the issues in this case. Dr. Aradillas's current professional duties focus on patients suffering from chronic (or complex) regional pain syndrome. Although his group of patients includes a handful of people with transverse myelitis (approximately seven), Dr. Aradillas treats the pain they are experiencing and does not treat their transverse myelitis. Dr. Aradillas currently is not teaching medical students as his academic appointment ended in 2015. Similarly, Dr. Aradillas has not acted as a peer-reviewer for journals since 2015.

In contrast, Dr. Naismith's neurology practice focuses on multiple sclerosis and other demyelinating disorders of the central nervous system, including neuromyelitis optica and myelin oligodendrocyte glycoprotein antibody-associated disease. Although these conditions are not transverse myelitis, multiple sclerosis is close to transverse myelitis as transverse myelitis can be how multiple sclerosis first presents. Dr. Naismith also holds an academic appointment and reviews manuscripts for journals. These accomplishments enhance Dr. Naismith's standing.

Beyond neurology, Dr. Naismith was also more informed about immunology and infectious diseases. This difference was made apparent when both experts were asked about why people are given two doses of mumps-measles-rubella ("MMR") vaccine in their lifetimes but are given the flu vaccine annually. Dr. Aradillas stated that the flu vaccine does not lead to the production of memory cells. The real problem is that flu viruses, unlike the measles virus, change each year. See Rajendran at 846.[15]

Consequently, the analysis that follows tends to rely more upon Dr. Naismith than Dr. Aradillas. It is important to note that a finding that Dr. Naismith is *more* qualified is not intended to suggest that Dr. Aradillas is *unqualified*. In a case involving complex regional pain syndrome, Dr. Aradillas may very well be highly qualified. It is just that the issues in Mr. Tutt's case did not fit well with Dr. Aradillas's area of advanced achievements.

---

[15] Madhusudan Rajendran et al., The Human Antibody Response to the Influenza Virus Neuraminidase Following Infection or Vaccination, 9 VACCINES 846 (2021). Filed as Exhibit 93.

## VI. Analysis Part Two: Causation

As explained above, petitioners in the Vaccine Program are required to prove each Althen prong by a preponderance of the evidence. The analysis begins with the first Althen prong, reviewing petitioner's theory and how the theory appeared to have shifted during the hearing. This is followed by an analysis of the third Althen prong, discussing the appropriate timeframe to infer causation, and then the second Althen prong, considering whether there is evidence of a logical sequence of cause and effect. The analysis concludes with a discussion of Mr. Tutt's upper respiratory infection as a possible cause of his transverse myelitis, using the same Althen framework and sequence.

### A. *Althen* Prong One—Medical Theory

"To meet prong one, 'a petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case, although the explanation need only be legally probable, not medically or scientifically certain." Dennington v. Sec'y of Health & Hum. Servs., 167 Fed. Cl. 640, 651-52 (2023) (internal quotation marks and citations omitted), appeal dismissed, No. 2024-1214, 2024 WL 1255318 (Fed. Cir. Mar. 25, 2024). Here, the requirement that the theory "pertain[] specifically to the petitioner's case" restricts the theory that petitioner can offer here as discussed in the next section.

#### 1. Summary of Petitioner's Theories

As reviewed in the summary of the experts' reports, a considerable challenge for linking the flu vaccination to the transverse myelitis concerns the chronology of events in Mr. Tutt's life. He developed transverse myelitis 68 days after the flu vaccination and suffered a non-specified upper respiratory infection in between.

Due to the long latency between vaccination and onset, a proposal that the flu vaccination caused the transverse myelitis via molecular mimicry was not likely to succeed. Special masters have found this much time exceeds the amount of time for which an inference of causation is appropriate. See, e.g., Goodwin v. Sec'y of Health & Hum. Servs., No. 19-503V, 2025 WL 3905158, at *30-34 (Fed. Cl. Spec. Mstr. Oct. 7, 2025), mot. for rev. denied, 181 Fed. Cl. 302, 315-16 (2026); Pearson v. Sec'y of Health & Hum. Servs., No. 16-9V, 2019 WL 3852633, at *16 (Fed. Cl. Spec. Mstr. July 31, 2019) (finding 74 days excessive and citing cases). Petitioner has *not* offered this theory.[16] Dr. Aradillas, himself, admitted that 68 days is outside the temporal

[16] Petitioner may legitimately point to a statement from a government website that states that transverse myelitis can be a "post-vaccine autoimmune phenomenon." Exhibit 95 (website of National Institute of Neurological Disorders and Stroke, retrieved Feb. 7, 2022). However, because this website does not say anything about the time for which transverse myelitis may be post-vaccinal, it offers little support for a theory that the flu vaccine, by itself, causes transverse myelitis that appears 68 days after vaccination.

Similarly, petitioner put forward a number of case reports and case series that generally report a vaccine (sometimes, but not always, a flu vaccine) preceded the onset of transverse myelitis within about 30 days. See Pet'r's Br. at 20-22; Pet'r's Am. Br. at 4. But, these pieces of

window associated with causation. Exhibit 100 at 2. However, he also proffered the Mealy paper for the point that "the risk of vaccine-associated relapses [in patients with NMO] within 30, 60, and 90 days [of vaccination] was significantly higher than the likelihood of a relapse spontaneously occurring within each of the given timeframes in patients not on preventive immunotherapy." Exhibit 97 at 1-2 (citing Mealy).

Instead, starting with Dr. Kurn's February 4, 2017 report, petitioner's experts have generally opined that mid-January upper respiratory infection combined with the consequences of the November 2013 flu vaccination to lead to Mr. Tutt's transverse myelitis. However, how these forces combined was not consistently explained.

Before the hearing, petitioner appeared to be presenting a theory with multiple steps, including (a) the flu vaccine leads to the production of antibodies, (b) the anti-flu antibodies persist for several months, (c) the mid-January upper respiratory infection stimulates Mr. Tutt's immune system, and (d) the immune system's response to the upper respiratory infection interacts with the *pre-existing* anti-flu antibodies to cause transverse myelitis. See Pet'r's Br. at 18, 21; see also Exhibit 81 at 11-12. In the analysis that follows, this will be referred to the "pre-existing antibody" theory.

However, during his testimony, Dr. Aradillas changed step (d) of the theory. Dr. Aradillas stated that the mid-January upper respiratory infection prompted the production of *new* antibodies and these new antibodies caused the transverse myelitis. In the analysis that follows, this will be referred to the "new antibody" theory. It is not readily apparent that Dr. Aradillas had disclosed this "new antibody" theory in a report before the hearing.

2. Analysis

Although there is confusion about the final step, which is the crucial step, in petitioner's theory, both variations of the theory start on solid foundation. For example, the parties agree that the November 14, 2013 flu vaccination leads to the production of antibodies. See Siegrist.[17] These anti-flu antibodies are what protect a recipient of the vaccine from the flu virus.

---

literature, which have been considered, often minimal, if any, support for a theory that the effects of a flu vaccine combine with the consequences of an upper respiratory infection to cause transverse myelitis. See Goodwin, 2025 WL 3905158, at *23-24; Bowling v. Sec'y of Health & Hum. Servs., No. 18-109V, 2023 WL 6846491, at *9-11 (Fed. Cl. Spec. Mstr. Sept. 20, 2023); Ridenour v. Sec'y of Health & Hum. Servs., No. 21-1392V, 2026 WL 1864238, at *16-19 (Fed. Cl. Spec. Mstr. June 2, 2026), mot. for rev. filed June 30, 2026.

Further, some case reports refrain from attributing causation. The Pidcock case series, for example, concludes: "However, the large fraction of younger children affected, the current recommended vaccination schedule for children, and the lack of any single vaccine association within this group all undermine a potential causal link between vaccination and ATM." F.S. Pidcock et al., Acute transverse myelitis in childhood: center-based analysis of 47 cases, 68 NEUROLOGY 1474 (2007). Filed as Exhibit 47.

[17] Claire-Anne Siegrist, Vaccine Immunology, in PLOTKIN'S VACCINES 16-34 (S. Plotkin et al. eds., 7th ed. 2018). Filed as Exhibit 87.

Moreover, the parties also agree that the anti-flu antibodies persist for a sufficient amount of time that they could have responded to a flu virus if Mr. Tutt were exposed in January 2014. In other words, the anti-flu antibodies were "biologically relevant" in January 2014 in relation to the flu virus. The key question is whether these persistent anti-flu antibodies would confer any increased risk of autoimmunity.

Petitioner did not provide a persuasive rationale. As to the pre-existing antibody theory, Dr. Aradillas was asked whether any literature supported this theory and he stated no. Although literature is not required, Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274 (Fed. Cir. 2005), "a scientific theory that lacks any empirical support will have limited persuasive force." Caves v. Sec'y of Health & Hum. Servs., 100 Fed. Cl. 119, 134 (2011), aff'd without opinion, 463 F. App'x 932 (Fed. Cir. 2012). Dr. Aradillas did not persuasively explain why Mr. Tutt's immune system would respond to the non-specific upper respiratory infection in a way that would lead the response to interact with or to augment the anti-flu antibodies. Antibodies are triggered by specific pathogens and even closely related pathogens, such as different strains of the flu virus, do not prompt a response from the immune system. Dr. Aradillas's inability to link the immune system's response to one antigen (the infectious agent responsible for the upper respiratory infection) to another antigen (the flu vaccine) constitutes a gap in theory, making it unpersuasive, and, therefore, not creditable.

Another gap involves the risk posed by the vaccine antibodies at 68 days post-vaccination. At the hearing, Dr. Aradillas explained that the Mealy article is relevant to Mr. Tutt's case because transverse myelitis and NMO have the same underlying mechanism as they are both antibody-mediated conditions. He asserted that Mealy demonstrates that patients were more likely to have a relapse of their NMO after an immune system boost (such as vaccination), and that the risk of relapse remained the same across 30, 60, and 90-day intervals. Dr. Naismith, on the other hand, characterized the Mealy study as exploratory, and stated that the p-value of .215 (corresponding to relapses) was not statistically significant. See Mealy at 79, 81 Fig. 1. Dr. Naismith further noted that the patients were untreated (i.e., not on preventative immunotherapy), and that it was challenging to interpret the results with this factor in mind. Dr. Naismith was more persuasive in his assessment of the Mealy article.

The new antibody theory fares no better. Under the new antibody theory, in January 2014, Mr. Tutt was exposed to an unidentified infectious agent and his response to this infectious agent led to antibodies that caused his transverse myelitis. It is not readily apparent why the adverse consequences of the new antibodies involved the response to the flu vaccine. If the anti-flu antibodies are taken out of the theory, then the opinion that Dr. Aradillas offered during the hearing matches the opinions Dr. Alexander and Dr. Naismith have consistently asserted—the mid-January upper respiratory infection is the sole cause of Mr. Tutt's transverse myelitis. See Section VI.D. below.

Thus, neither the pre-existing antibody theory nor the new antibody theory provides a sufficiently reliable explanation for how the November 14, 2013 flu vaccination could have caused Mr. Tutt's transverse myelitis, which was manifest on January 21, 2014, 68 days later. A final, but related, point regarding the theories is that Dr. Aradillas did not explain in any detail the mechanism by which the combined effects of the flu vaccine and the upper respiratory infection led to the transverse myelitis. It is certainly true that Dr. Aradillas mentioned concepts

such as molecular mimicry, bystander activation, epitope spreading and polyclonal B cell activation. But, these mentions were no more than a sentence or two.

Petitioner argues that he proposed the same medical theory that the undersigned credited in Eamick. See Pet'r's Br. at 7, 16 (citing Eamick v. Sec'y of Health & Hum. Servs., No. 15-519V, 2018 WL 2926048 (Fed. Cl. Spec. Mstr. May 15, 2018)). As a preliminary point, Eamick is not binding precedent. Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d 1351, 1358 (Fed. Cir. 2019). More importantly, the chronology of events in Eamick differed. Mr. Eamick received his first vaccinations on June 15, 2012. Three weeks later, on July 7, 2012, he complained of a respiratory infection. Ten days later, on July 17, 2012, he received his second vaccinations. His respiratory infection had also worsened during this time. Mr. Eamick's GBS first manifested on July 24, 2012. Thus, Mr. Eamick's vaccinations coincided with his response to the upper respiratory infection. The theory in Eamick thus did not require vaccine antibodies to confer a risk of autoimmunity for over 60 days post-vaccination.

Overall, petitioner failed to present a persuasive theory "specific" to his case to explain how the flu vaccine could have caused transverse myelitis 68 days later. This lack of preponderant evidence means that petitioner cannot receive compensation. Nevertheless, the remaining Althen prongs are briefly discussed.

### B. *Althen* Prong Three—Timing

The third Althen prong actually contains two parts. A petitioner must show the "timeframe for which it is medically acceptable to infer causation" and the onset of the disease occurred in this period. Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 542-43 (2011), recons. denied after remand on other grounds, 105 Fed. Cl. 353 (2012), aff'd without op., 503 F. App'x 952 (Fed. Cir. 2013). The medically acceptable timeframe depends, at least in part, on the theory being offered. Langland v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 421, 443 (2013).

Here, the deficiencies with the theories interfere with an assessment of the first part of the third Althen prong. As explained above, while reliable evidence shows that anti-flu antibodies last for at least 90 days, how these anti-flu antibodies interact with the response to the unspecified pathogen causing an upper respiratory infection to cause transverse myelitis is far from clear.[18]

On the other hand, if there were a reliable theory to explain how a stimulation to the immune system could affect pre-existing antibodies, then the timing might be appropriate. But, any finding on Althen prong three in petitioner's favor would be academic because "Temporal association is not sufficient, however, to establish causation in fact." Grant v. Sec'y of Health & Hum. Servs., 956 F.2d 1144 (Fed. Cir. 1992).

---

[18] Again, petitioner's theories involve the mid-January upper respiratory infection interacting with the anti-flu antibodies. If petitioner's theory did not involve the upper respiratory infection, then the latency between the vaccination and the transverse myelitis is too long. See Goodwin, 2025 WL 3905158, at *30-34.

### C. *Althen* Prong Two—Logical Sequence

The second Althen prong requires preponderant evidence for "a logical sequence of cause and effect showing that the vaccination was the reason for the injury." Althen, 418 F.3d at 1278. With respect to this prong, the Federal Circuit has instructed special masters to consider carefully the views of a treating doctor. Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006).

Here, there appears to be a lack of supporting evidence from treating doctors. The parties were directed to identify any statements from treating doctors regarding causation. Order for Pre-Trial Br., issued May 23, 2023, at 7. However, petitioner did not. See Pet'r's Br.

Although petitioner did not bring forward any statements from treating doctors that support the claim that the November 14, 2013 flu vaccination harmed him, petitioner presents an argument regarding prong two that asserts, in part, there is no alternative etiology. Pet'r's Br. at 8. This argument brings up another relevant question, whether a factor unrelated to the vaccine explains Mr. Tutt's condition.

### D. Alternative Causes

Whether an argument regarding an alternative cause for the vaccinee's injury should be considered within Althen prong two is not entirely clear. Compare Winkler v. Sec'y of Health & Hum. Servs., 88 F.4th 958, 962 (Fed. Cir. 2023) (ruling special master did not err in considering a potential alternative cause in prong two); Stone v. Sec'y of Health & Hum. Servs., 676 F.3d 1373, 1380 (Fed. Cir. 2012); Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d 1352, 1357 (Fed. Cir. 2006) (ruling that the special master could consider alternative causes); id. at 1360 (Dyk, J., dissenting) (the "majority holds that petitioner seeking compensation ... must establish ... an absence of 'alternative causes' of the injury") with Walther v. Sec'y of Health & Hum. Servs., 485 F.3d 1146, 1149 (Fed. Cir. 2007) (ruling that requiring a "petitioner to establish a lack of alternative causation was erroneous").

The Secretary, through his experts, argued that Mr. Tutt's mid-January upper respiratory infection was the sole cause of his transverse myelitis. To evaluate whether this infection caused Mr. Tutt's condition, Dr. Alexander and Dr. Naismith's proposal will be analyzed via a structure based upon Althen. See Knudsen v. Sec'y of Health & Hum. Servs., 35 F.3d 543, 549 (Fed. Cir. 1994) ("the standards that apply to a petitioner's proof of actual causation in fact in off-table cases should be the same as those that apply to the government's proof of alternative actual causation in fact"); Oliver v. Sec'y of Health & Hum. Servs., No. 10-394V, 2017 WL 747846, at *24-27 (Fed. Cl. Spec. Mstr. Feb. 1, 2017) (following this method of analysis), mot. for rev. denied, 133 Fed. Cl. 341 (2017), aff'd, 900 F.3d 1357 (Fed. Cir. 2018); Stricker v. Sec'y of Health & Hum. Servs., No. 18-56V, 2024 WL 263189, at *25-29 (Fed. Cl. Spec. Mstr. Jan. 2, 2024), mot. for rev. denied, 170 Fed. Cl. 701 (2024).

#### 1. Prong One—Medical Theory for Upper Respiratory Infection and Transverse Myelitis

Dr. Alexander's initial report identified the unidentified upper respiratory infection as the sole cause of Mr. Tutt's transverse myelitis. Exhibit A at 5-6, 8. Since that report, the experts

have commented upon whether this infection was exclusively responsible. See, e.g., Exhibit I at 6.

During the hearing, Dr. Aradillas agreed that upper respiratory infections, by themselves, can cause transverse myelitis. This concession is not that surprising in the sense that Dr. Aradillas's theories all implicate the unidentified pathogen to some degree. See Section VI.A.1, above. Dr. Aradillas did not require knowing more about the microbiology of the unidentified pathogen.

Dr. Naismith, likewise, maintained that an upper respiratory infection can cause transverse myelitis. He based his opinion on reports in the literature. See West at 101, Table 2 (listing coxsackie viruses).[19] The theory by which an upper respiratory infection causes transverse myelitis was not readily apparent. For example, on cross-examination, Dr. Naismith acknowledged that he could not propose molecular mimicry because he did not know the molecular structure of the unidentified infectious agent.

Dr. Naismith's inability to provide a theory by which an unidentified infectious agent can cause transverse myelitis is concerning. However, this gap is not decisive by itself because Dr. Aradillas agreed that unidentified respiratory infections can cause transverse myelitis. In other words, for the prong one part, there is no dispute. In the absence of a dispute, it is easy to find that the evidence preponderates in favor of finding that unidentified pathogens responsible for an upper respiratory infection can cause transverse myelitis.

2. Prong Three—Appropriate Interval

On January 13, 2014, Mr. Tutt sought care for his upper respiratory infection symptoms on January 13, 2014, reporting an onset of three days prior, or January 10, 2014. Exhibit 4 at 497. The onset of Mr. Tutt's transverse myelitis was January 21, 2014, or eleven days after the onset of his upper respiratory infection. Exhibit 4 at 622.

Dr. Naismith proposed that the interval of 11 days was appropriate. Exhibit I at 6. Dr. Aradillas did not dispute timing. Again, it would have been difficult for Dr. Aradillas to dispute timing because his theory for how the flu vaccine caused the transverse myelitis involves the upper respiratory infection. Thus, a preponderance of evidence supports a finding that the 11-day interval between the upper respiratory infection and the onset of transverse myelitis is one for which an inference of causation is appropriate.

3. Prong Two—Logical Sequence

As noted earlier, in considering whether there is a "logical sequence," the Federal Circuit has instructed special masters to consider carefully the views of a treating doctor. Capizzano, 440 F.3d at 1326.

Here, admittedly, there is not an abundant amount of evidence regarding the treaters' views about causation. However, at least one medical record does show that a doctor who was

[19] Timothy W. West et al., Acute transverse myelitis: demyelinating, inflammatory, and infectious myelopathies, 32 SEMIN. NEUROL. 97 (2012). Filed as Exhibit I, Tab 1.

treating Mr. Tutt was considering whether he suffered from a "post-infectious" transverse myelitis. Exhibit 4 at 591.

4. Summary regarding Alternative Cause

At a minimum, the Secretary's assertion that the unidentified source of the upper respiratory infection caused Mr. Tutt's transverse myelitis is not frivolous. Petitioner's theory for how the flu vaccine caused the transverse myelitis involves the upper respiratory infection in some way. Dr. Alexander and Dr. Naismith both asserted that the upper respiratory infection was the sole cause of the transverse myelitis without any contribution from the flu vaccination.

Whether the evidence preponderates in favor of finding the upper respiratory infection as the sole cause is difficult. As noted above, the evidence regarding the second prong (apart from the competing opinions of Dr. Aradillas and Dr. Naismith) is not particularly robust. Ultimately, it is not necessary to resolve this question. It is sufficient to find that the upper respiratory infection, by itself, is a better explanation than a theory that the flu vaccination combined with the upper respiratory infection to cause transverse myelitis. See Stricker v. Sec'y of Health & Hum. Servs., No. 18-56V, 2024 WL 263189, at *28 (Fed. Cl. Spec. Mstr. Jan. 2, 2024) (finding that petitioner's infection with the human papillomavirus was a better explanation for the cause of her systemic lupus erythematous than the vaccine against human papillomavirus), mot. for rev. denied, 170 Fed. Cl. 701 (2024); M.R. v. Sec'y of Health & Hum. Servs., No. 16-1024V, 2023 WL 4936727, at *36-38 (Fed. Cl. Spec. Mstr. June 30, 2023) (finding a neuroma, not a flu vaccine, was the better explanation for petitioner's hearing loss). This discussion of the second Althen prong and alternative causes is, in a way, academic because the primary flaw in petitioner's case is the lack of a persuasive theory to explain how the flu vaccine affected Mr. Tutt's response to the upper respiratory infection approximately two months later.

## VII. Conclusion

Thomas Tutt experienced an extremely difficult course of transverse myelitis and for the pain and suffering he endured, he merits a considerable amount of sympathy. David Tutt, too, no doubt suffered, too, as he watched his father decline with this terrible illness, which began 68 days after the flu vaccination.

Special masters, however, cannot resolve claims based upon sympathy for the injured person. To receive compensation, petitioners must establish their claims with evidence.

Petitioner's efforts to explain how the flu vaccination could have caused transverse myelitis that started so long after the vaccination were not persuasive. Although petitioner attempted to postulate that the flu vaccination led to the production of anti-flu antibodies that somehow made Mr. Tutt susceptible to the consequences of an infection with an unspecified pathogen that led to an upper respiratory illness about two weeks before the transverse myelitis, this attempt lacked persuasiveness. Therefore, petitioner has not met his burden of proof.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed. Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims.

IT IS SO ORDERED.

s/Christian J. Moran
Christian J. Moran
Special Master